FILED

2014 JUL 25 AM 8:29

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY_____ DEPUTY

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HELMUTS SKUJA,<br><br>      Plaintiff,<br><br>vs.<br><br>CAROLYN W. COLVIN, *acting Commissioner of Social Security*,<br><br>      Defendant. | CASE NO. 13cv0730-BAS(KSC)<br><br>**REPORT AND RECOMMENDATION DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**<br><br>[Doc. Nos. 16, 17] |

  Pursuant to Title 42, United States Code, Section 405(g) of the Social Security Act ("SSA"), plaintiff Helmuts Skuja ("plaintiff") filed a Complaint on March 27, 2013 to obtain judicial review of a final decision by the Commissioner of Social Security ("defendant") denying his claim for supplemental security income ("SSI").[1] [Doc. No. 1] On March 28, 2013, this case was referred to the undersigned Magistrate Judge for a Report and Recommendation as to all matters associated with this action. [Doc. No. 4; *See* 28 U.S.C. § 636(b)(1)(B)] Presently before the Court are: (1) plaintiff's Motion

---

[1] Title 42, United States Code, Section 405(g), provides as follows: "Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party ... may obtain a review of such decision by a civil action ... brought in the district court of the United States.... The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner ... as to any fact, if supported by substantial evidence, shall be conclusive."

for Summary Judgment [Doc. No. 16]; (2) defendant's Cross-Motion for Summary Judgment [Doc. No. 17]; (3) defendant's Memorandum in Support of its Cross-Motion and in Opposition to plaintiff's Motion [Doc. No. 18]; and, (4) the Administrative Record ("AR") [Doc. Nos. 13, 14].

After considering the moving and opposing papers [Doc. Nos. 16, 17, 18], the Administrative Record [Doc. Nos. 13, 14], and the applicable law, the Court **RECOMMENDS** that plaintiff's Motion for Summary Judgment [Doc. No. 16] be **DENIED**, and that defendant's Cross-Motion for Summary Judgment [Doc. No. 17] be **GRANTED**.

## I. PROCEDURAL HISTORY

Plaintiff filed applications for SSI on December 10, 2008 and May 6, 2010, alleging disability beginning on September 23, 1999. [AR 176-86] After defendant denied plaintiff's applications at both the initial and reconsideration levels [AR at 90-93, 114-19], plaintiff filed a written request for a hearing and appeared before Administrative Law Judge ("ALJ") Edward Steinman on November 2, 2011 in San Diego, California. [AR at 41-87] ALJ Steinman heard testimony from plaintiff and vocational expert Mary Jesko. *Id.* Although advised of his right to representation, plaintiff chose to appear and testify without the assistance of counsel or other representative. [AR at 11, 43] Based on the testimony and the documentary evidence, on November 10, 2011, the ALJ issued his written decision, finding that plaintiff was not disabled under the SSA. [AR at 11-25] The ALJ's finding that plaintiff was not disabled became defendant's final decision on January 30, 2013, when the Appeals Council declined plaintiff's request for review. [AR at 1-5]

///
///
///
///
///

## II. RELEVANT FACTS

### A. Background

Plaintiff was born on May 5, 1966. [AR at 692] He completed his primary and secondary education in Latvia[2] [AR at 259], attended three years of college [AR at 697] as well as three years of what he identifies as law school [AR at 700], and is able to communicate effectively in English [AR at 695]. Plaintiff's past work experience includes the occupations of commercial safety advisor, private investigator/analyst, security officer, and site supervisor/inspector. [AR at 697] Plaintiff complains of chronic pain in his spine, abdominal muscles, left ankle, liver, head, left shoulder, left arm, and left hip. [AR at 705]

Plaintiff attributes the pain in his spine to two gunshot wounds he sustained in 1999 in his capacity as an investigator for the Latvian State Revenue Service. As to the bullet wounds specifically, plaintiff believes he must restrict his movement because the bullets are still lodged in his body, and he fears that excessive movement will cause them to become dislodged and cause further harm. [AR at 706] Plaintiff claims that all of these problems collectively prevent him from working, that the pain has steadily increased in frequency and severity over time, and that he is limited in reaching, holding, manual dexterity, and walking due to the pain on his left side. [AR at 705] He contends that his pain makes it difficult to bathe, dress, walk for longer than 1.5 to 2 hours, sit or stand for longer than 1.5 to 2 hours, carry items, get in and out of vehicles, and sleep at night. [AR at 708] To treat this pain, plaintiff uses Aspirin, Echinacea, glucosamine supplements, hot patches, milk thistle, multivitamin supplements, and Salonpas — all over the counter products not requiring a prescription. [AR at 715]

---

[2] Plaintiff is a native of Latvia who was granted asylum in the United States in 2007. Accordingly, it is unclear how his educational background translates or correlates with educational levels which are commonly available in the United States. In identifying his highest grade of education completed, he checked the box for "12+". [AR at 679]

### B. Medical Evidence

#### 1. Plaintiff's Omnibus Submission

In support of his claim for SSI, plaintiff submitted a cover letter along with various medical records, spanning from 1999 to 2007. [AR at 1433-60] Included in the voluminous submission were the following:

    a.    a letter to plaintiff from J. A. Peress, M.D., Chief of Urology at Parkway Hospital in Forest Hills, New York, dated October 18, 1999, in which Dr. Peress opines that "surgical removal of the bullets will give you very few to no benefits at all, [and that] we expect you to be able to live with these bullets inside your body at [their] current position harmoniously and without any increased discomfort" [AR at 1441];

    b.    an August 17, 2001 report from Riga Municipal Hospital No. 1, translated from Latvian, containing key recommendations and observations surrounding plaintiff's gunshot wounds, namely that the risks of surgical intervention outweigh the benefits, and that the risk of bullet migration is increased with heightened physical activity [AR at 1449-55];

    c.    a Physical Incapacity Certificate, dated December 4, 2002, issued by the Ministry of Welfare of the Republic of Latvia, recognizing plaintiff as "a physically incapable person of the 3rd (third) group" in Latvia [AR at 1440];

    d.    a May 27, 2003 extract from SIA Health and Medical Rehabilitation, translated from Latvian, recommending that plaintiff increase his physical activity carefully and under a neurologist's supervision, so as to help increase range of motion and limit the effects of scar tissue [AR at 1447];

    e.    an application completed by plaintiff for New Jersey Transit's Reduced Fare Program, wherein plaintiff claims disability since January 2004, indicating "spinal injury with limited mobility [and] danger of paralysis" [AR at 1442-43];

    f.    a May 11, 2006 report from AP Diagnostic Imaging in Roselle Park, New Jersey wherein CT Scans of plaintiff's lumbar and thoracic spine reveal at least two bullet fragments, but also show no significant nerve root compressions caused by the

fragments and that the remainder of the soft tissue was normal [AR at 1444-45]; and,

  g. a November 7, 2007 letter from Steven Parker, D.O. of Roselle Park, New Jersey, in which he opines that any surgical attempt to remove the bullet fragments could result in damage to the nerves, muscle tissue, and spine, and that a "life threatening situation could result as a consequence of exercise should the bullets or bone fragments migrate" [AR at 1446].

### 2. Sandra Eriks, M.D. - State Consultative Examiner (internist) (2010)

On July 28, 2010, Dr. Eriks executed a summary report of the Internal Medicine Evaluation performed on plaintiff at QTC Medical Group. [AR at 1461-69] Dr. Eriks noted that plaintiff sent, via registered mail, approximately 250 pages in advance of the evaluation, including medical records from both the East Coast and Latvia (translated). [AR at 1462] Dr. Eriks evaluated the records presented regarding plaintiff's two gunshot wounds. Plaintiff reported having occasional pain in his thoracic spine, but did not complain of any pain in his extremities. *Id.* To manage the pain, plaintiff reported taking two Aspirins up to twice daily, and also taking an Aleve roughly once a week. *Id.* "[Plaintiff] state[d] that mainly he does absolutely no movement, as he was told by doctors in Latvia that if he moved, the bullet fragments could move from where there were and kill him instantly. . . . [S]ince th[at] time, he has refused to do any movement." [AR at 1463] In addition, plaintiff complained of a recent onset of left shoulder pain; however, he had not been evaluated by a physician and reported that the pain dissipates by either taking Aspirin or Aleve. *Id.*

As to his daily routine, plaintiff lives with his wife, "works full time on the computer" as a private investigator, does nothing to help his wife around that house, and is working hard to obtain a job that would allow him to work from home (primarily on the computer). Most of his day is taken up by working on the computer and sitting. *Id.* Dr. Eriks noted that plaintiff drove himself to the visit. *Id.*

Upon physical examination, plaintiff was oriented and appropriate, had full range of motion and full strength in his extremities, and walked with a normal gait.

[AR at 1464-65] Some moderate tenderness was found in the thoracic spine, but an examination of plaintiff's back yielded otherwise normal findings. [AR at 1465] Dr. Eriks noted the following:

> The claimant also told me that he was unable to dress himself or undress himself and insisted that his wife be in the room. The wife was asked to remain in the waiting room during the examination, which she did. He was noted to dress himself quite quickly after the examination and left the room with no problems. He also removed and later replace his shirt, tie, and suit coat for x-rays without difficulty. It was also noted that the wife removed a recording device from the briefcase that she had left in the room immediately after leaving the examination.

[AR at 1465-66]

Dr. Eriks concluded that any tenderness in plaintiff's thoracic spine was superficial, that his range of motion was within normal limits without evidence of radiculopathy, and that, based on the x-ray, the bullets were most likely in the soft tissue. [AR at 1466] Based on her examination, Dr. Eriks stated that plaintiff had no restrictions or special limitations in the areas of lifting, carrying, standing, walking, or sitting. *Id.* Further, she found plaintiff had no postural, manipulative, visual, communicative, or environmental limitations. *Id.*

### 3. Victor Prieto, M.D. (St. Francis Memorial - Sports Medicine) (2011)

On April 19, 2011, plaintiff visited Dr. Prieto presenting "with a multitude of various orthopedic, as well as psychosocial problems." [AR at 1489] In Dr. Prieto's opinion, the most pressing issue was plaintiff's left ankle, which sustained an injury many years ago and required surgery and insertion of hardware (which was subsequently removed). Plaintiff complained of residual ankle aches and pains, soreness, and stiffness. Dr. Prieto noted that none of plaintiff's complaints were of an advanced nature, "but [plaintiff] is worried and concerned nonetheless." *Id.* Dr. Prieto reassured plaintiff that the discomfort was normal, usual, and customary, and that he "should get used to it" because "this is the way it is going to be the rest of his life." [AR at 1489] Dr. Prieto opined that the pain will likely not spike to a severe magnitude, but that it could cause intermittent and moderate discomfort. *Id.*

Dr. Prieto also discovered what he thought might be an incisional hernia on plaintiff's abdomen, and referred him to Dr. James Macho for consultation regarding the same. *Id.* Regarding plaintiff's stated pain associated with the imbedded gunshot fragments, Dr. Prieto informed plaintiff that "whatever local pain he has is more likely permanent" and will continue to cause low-grade discomfort, but that the fragments have remained unchanged based on a comparison of many scans. *Id.* It was Dr. Prieto's opinion "to just leave well enough alone," and that any benefits of surgical removal were outweighed by the risks. *Id.* As to the issue of plaintiff's frozen left shoulder, Dr. Prieto reports that this injury is unrelated to the gunshot wounds, came on in a nontraumatic fashion, can be described as fairly moderate to advanced in nature, and impacts range of motion but not strength. *Id.* Dr. Prieto injected the shoulder, which alleviated much of the pain and improved the range of motion substantially. [AR at 1489-91] Dr. Prieto described plaintiff's prognosis as "very promising" if a regimen of rehabilitation, anti-inflammatories, and a possible repeat injection was followed. "I reassured the patient that the shoulder problem is typically a nonsurgical problem and there is no need for an MRI scan or a CT scan regarding his shoulder." [AR at 1491]

On June 2, 2011, Dr. Prieto executed an "addendum report" based on "[s]everal questions [that] have been brought to pass." [AR at 1487-88] In this addendum, Dr. Prieto reinforced and reiterated his opinion that surgical removal of the bullet fragments was not necessary, and that plaintiff's moderately frozen shoulder was not a surgical problem and that he should regain much of his function (including overhead lifting with this shoulder) within 12 months. [AR at 1487] Dr. Prieto stated that it will not be unusual for the bullet-related pain to be exacerbated by sitting or standing for longer than 90 minutes, and that it is reasonable to expect that plaintiff will need to change position every 90 to 120 minutes. *Id.* As to the limitations posed by plaintiff's left ankle, Dr. Prieto states continuous walking should be restricted to no more than 90 minutes, and continuous standing should be restricted by the same. *Id.* "Regarding all of these issues, I believe a reasonable physical therapy regimen, [and] working with a

trainer over the next several weeks to months, would be extremely beneficial and helpful for improving quality of life, strength and function of ankle, back, hip and spine area." [AR at 1488]

### 4. James R. Macho, M.D. (Orthopedic Surgeon) (2011)

Dr. Prieto referred plaintiff to Dr. Macho for evaluation of his abdominal and liver pain. On April 21, 2011, Dr. Macho wrote a letter to Dr. Prieto explaining his evaluation, findings, and recommendations regarding plaintiff. [AR at 1483-85] Plaintiff complained of abdominal pain, and speculated that he may have a hernia. [AR at 1483] Plaintiff reported that his pain interferes with his daily care, ability to dress, and participate in sports or other leisure activities requiring stamina. *Id.* Plaintiff specifically asked Dr. Macho "to evaluate his anterior abdominal wall and his liver regarding hepatitis that he sustained while traveling with a rugby team in 1982." *Id.* Dr. Macho's evaluation of plaintiff included a 30 minute face-to-face contact, a detailed physical examination, and the review of (1) approximately 70 pages of provided records; (2) a packet of radiographs; and, (3) a completed questionnaire. *Id.*

Upon physical examination, Dr. Macho found no evidence of a hernia and discussed his findings with plaintiff. Specifically,

> I advised him that I did not find evidence of a primary problem regarding his abdominal wall or his abdominal organs. I explained that he does not have a true hernia of his abdominal wall but rather a separation of the rectus muscles with some attention of the linea alba. . . . This does not represent a dangerous condition as there is no risk of incarceration or strangulation. I also explained that a major component of his abdominal symptoms could be referred pain from his back. The location of the bullets at T 8-9 and T 12 would correspond to dermatomes in the mid abdomen. For these reasons, I advised [plaintiff] that he would not likely benefit from any surgical procedure on his abdominal wall.

[AR at 1485]

As to the hepatitis issue, Dr. Macho informed plaintiff that his liver was normal upon examination, and thus was an unlikely source of his pain symptoms. *Id.* Further, liver function tests revealed minor abnormalities identified as clinically insignificant,

leading Dr. Macho to opine that no further work up was necessary. *Id*. Dr. Macho concluded by recommending an exercise program in order to build up plaintiff's abdominal wall muscles, and suggested that he might benefit from consultation with a physical therapist for purposes of identifying exercises that he could carry out without exacerbating his pain. *Id*.

### III. ALJ HEARING AND DECISION

#### A. Plaintiff's Testimony

At the November 2, 2011 hearing before ALJ Steinman, plaintiff stated that due to chronic pain in his spinal area, abdomen, liver, left ankle, and left shoulder, as well as sporadic pain in his left hip, he is unable to care for himself or work. [AR at 61-68] Plaintiff estimates that he is able to lift and carry 5 pounds; sit for approximately 1 hour before needing to stand or change position; sit for 4 or 5 hours in an 8 hour workday, assuming he was permitted to change positions; stand a maximum of 1 hour before needing to sit; and, stand or walk for up to 3 hours in an 8 hour workday, again assuming he was permitted to otherwise change positions in between. [AR at 69-71] Plaintiff testified that he could work a full 8 hour workday if he was permitted to take 15 minute breaks at least once an hour, totally 2 hours of break during a day. [AR at 71-72]

For his pain, plaintiff takes two Aspirin, twice daily, and Vicodin or Tramadol on days when the pain increases, which he estimates is once or twice per week. [AR at 72-74] Plaintiff testified that he lives with his wife, that he drives her to and from work each day (10 minutes each way), and that he is able to walk to the grocery store across the street. [AR at 75-76] During a typical day, plaintiff reports looking for work online, and doing no cooking or cleaning for the household. [AR at 76-77] When not sitting at the computer looking for work, plaintiff takes breaks by lying down in bed. [AR at 77] On certain, rare occasions, plaintiff will drive his wife to grocery stores for items not contained at the nearby store, and reports attending church infrequently. [AR at 78] Plaintiff reports receiving food stamps, but states that his application for Medi-

CAL was rejected. [AR at 79-80]  Plaintiff testified that he does not have a local primary care physician. [AR at 81]

### B. The Written ALJ Decision

On November 10, 2011, ALJ Steinman issued a written decision denying plaintiff's claim for SSI, finding that plaintiff was not disabled within the meaning of the SSA. [AR at 11-19]  First, and despite plaintiff reporting that he had worked since the date of his application, the ALJ concluded that plaintiff had not engaged in substantial gainful activity since the application date, December 10, 2008. [AR at 13]  At step two, the ALJ found plaintiff suffered from the following "severe" impairments, as defined in the Regulations: two bullets in the lower back, frozen left shoulder, and left ankle pain post open reduction and internal fixation. [AR at 13, citing 20 C.F.R. § 416.920(c)]  At step three, however, plaintiff was found to have no impairment, or combination thereof, that met or equaled an impairment listed under 20 C.F.R. §§ 416.920(d), 416.925, and 416.926. [AR at 14]  Specifically, the ALJ found: "The record does not report the existence of any functional limitations and or diagnostic test results, which would suggest that the impairments meet or equal the criteria of any specific listing.  In addition, no treating or examining physician has reported findings, which either meet or are equivalent in severity to the criteria of any listed impairment, nor are such findings indicated or suggested by the medical evidence of record." *Id.*

In assessing plaintiff's residual functional capacity ("RFC") at step four, plaintiff was deemed capable of performing light work as defined in 20 C.F.R. § 416.967(b), except that he (1) may need to change position every 30 minutes to 2 hours; (2) can stand no more than 1.5 hours continuously; and, (3) cannot perform overhead working until the end of 2011 due to his temporarily frozen left shoulder. [AR at 14]  Considering this RFC and the testimony from vocational expert Mary Jesko, the ALJ found plaintiff capable of performing both his past relevant work as an investigator, as well as other jobs existing in the national economy. [AR at 17]  Specifically, considering plaintiff's age, education, work experience, and RFC, the ALJ found at

step five that jobs exist in significant numbers in the national economy that plaintiff is capable of performing, specifically as a counter clerk, mail clerk, and small parts assembler. [AR at 18]

While the ALJ found that plaintiff's above-mentioned impairments could reasonably be expected to cause the alleged symptoms, he found plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms" not credible to the extent they are inconsistent with his RFC assessment. [AR at 15]

## IV. LEGAL STANDARDS

### A. Evaluating SSI Claims

To qualify for SSI benefits under the Social Security Act, an applicant must show that he or she is unable to engage in any substantial gainful activity because of a medically determinable physical or mental impairment that has lasted or can be expected to last at least 12 months or cause death. 42 U.S.C. §§ 423(d), 1382. The Social Security Regulations set out a five-step process for determining whether a person is disabled within the meaning of the SSA. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a); *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999); *Batson v. Comm'r of the Social Security Admin.*, 359 F.3d 1190, 1194 (9th Cir. 2004). If a party is found to be "disabled" or "not disabled" at any step in the sequence, there is no need to consider subsequent steps. 20 C.F.R. § 416.920.

First, the ALJ must determine whether the applicant is engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(I), 416.920(a)(4)(I). If not, then the ALJ must determine whether the applicant is suffering from a "severe" impairment within the meaning of the Regulations. *Id.* If the impairment is severe, the ALJ must then determine whether it meets or equals one of the "Listing of Impairments" in the Regulations. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If the applicant's impairment meets or equals a Listing, the ALJ must then determine whether the applicant retains the residual functional capacity ("RFC") to perform his or her past relevant work. *Id.* If the impairment does not meet or equal a Listing, the ALJ must

determine whether the applicant retains the residual functional capacity to perform his or her past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the applicant cannot perform past relevant work, the ALJ–at step five–must consider whether the applicant can perform any other work that exists in the national economy. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

While the applicant carries the burden of proving eligibility at steps one through four, the burden at step five rests on the agency. *Celaya v. Halter*, 332 F.3d 1177, 1180 (9th Cir. 2003). Applicants not disqualified at step five are eligible for disability benefits. *Id.*

### 1. Substantial Evidence

The SSA provides for judicial review of a final agency decision denying a claim for SSI. 42 U.S.C. § 405(g). A reviewing court must affirm the denial of benefits if the agency's decision is supported by substantial evidence and applies the correct legal standards. *Id.*; *Batson*, 359 F.3d at 1193. Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Osenbrock v. Apfel*, 240 F.3d 1157, 1162 (9th Cir. 2001). When the evidence is susceptible to more than one reasonable interpretation, an agency's otherwise reasonable decision must be upheld. *Batson*, 359 F.3d at 1193. Where, as here, the Appeals Council denies a request for review, the ALJ's decision becomes the final agency decision that the court reviews. *Id.* at 1193 n.1.

### 2. Allocating Weight to Medical Opinions

When presented with conflicting medical opinions, the ALJ must determine credibility and resolve the conflict. *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992). Greater weight must be given to the opinion of treating physicians, and in the case of conflict, "the ALJ must give specific, legitimate reasons for disregarding the opinion of the treating physician." *Id.* However, this does not mean the treating physician's opinion is dispositive. To the contrary, no physician's opinion is binding "with respect to the existence of a claimant's impairment or the ultimate determination

of disability." *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001). Instead, an ALJ is to weigh the medical opinion evidence as a whole, considering the entire record. 20 C.F.R. § 404.1527. Further, an ALJ should not give controlling weight to a treating physician's opinion of limitations unless it is "well-supported" and "not inconsistent" with other substantial evidence in the record. *Id.* at (d)(2).

### 3. Credibility of Claimant

In deciding whether to credit a party's testimony about subjective symptoms or limitations, the ALJ must engage in a two-step analysis. *Batson*, 359 F.3d at 1196; *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996). First, the party must produce objective medical evidence of an underlying impairment that could reasonably be expected to produce pain or other symptoms. *Batson*, 359 F.3d at 1195; *Smolen*, 80 F.3d at 1281. If this test is satisfied, and there is no affirmative defense that the party is malingering, then the ALJ must determine the credibility of the party's subjective complaints. *See Robbins v. Social Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006). In assessing the credibility of a party's subjective complaints, the ALJ may consider such factors as the party's reputation for truthfulness, daily activities, and any inconsistencies in the statements. *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997); *Smolen*, 80 F.3d at 1284. While the ALJ must not disregard a party's testimony about the severity of pain solely due to a lack of substantiation by objective medical evidence, Congress expressly prohibits granting disability benefits based solely on a party's subjective complaints. *See Robbins*, 466 F.3d at 883; 42 U.S.C. § 423(d)(5)(A)("An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability."). An ALJ's credibility finding must be properly supported by the record and sufficiently specific to ensure a reviewing court that he or she did not "arbitrarily discredit" a party's subjective testimony. *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002).

/ / /

/ / /

## V. DISCUSSION

Plaintiff argues that there was no substantial evidence to support the ALJ's decision denying him SSI benefits, taking particular issue with the lack of weight given to his testimony and the ALJ's alleged failure to provide legitimate and specific reasons for discounting his testimony. [Doc. No. 16-1, pp. 3-11] Defendant argues that the ALJ provided four specific and compelling reasons for discounting plaintiff's subjective testimony, to the extent that it was with inconsistent with the overall record. [Doc. No. 17-1, pp. 3- 7] This is the sole legal issue raised by plaintiff in this action. As outlined in greater detail below, the ALJ's findings are supported by substantial evidence and free of legal error because the ALJ provided specific and legitimate reasons for discounting plaintiff's subjective claims. The ALJ methodically evaluated the opinions of the treating physicians, plaintiff's testimony, the reports of other medical professionals, and plaintiff's entire medical record and provided clear and convincing reasons for discounting certain of plaintiff's subjective claims.

At the November 2, 2011 hearing before ALJ Steinman, plaintiff testified that his disabling pain symptoms render him unable to care for himself or work. [AR at 61-68] Plaintiff estimates that he is able to lift and carry 5 pounds; sit for approximately 1 hour before needing to stand or change position; sit for 4 or 5 hours in an 8 hour workday, assuming he was permitted to change positions; stand a maximum of 1 hour before needing to sit; stand or walk for up to 3 hours in an 8 hour workday; and, that he could work a full 8 hour workday if he was permitted to take 15 minute breaks at least once an hour, totaling 2 hours of break during a normal day. [AR at 69-72] The ALJ, however, ultimately assigned plaintiff an RFC[3] not entirely consistent with his testimony, and found plaintiff's "statements concerning the intensity, persistence and

---

[3] Plaintiff was deemed capable of performing light work as defined in 20 C.F.R. § 416.967(b), except that he (1) may need to change position every 30 minutes to 2 hours; (2) can stand no more than 1.5 hours continuously; and, (3) cannot perform overhead working until the end of 2011 due to his temporarily frozen left shoulder. [AR at 14]

limiting effects of these symptoms are not credible to the extent they are inconsistent with the above [RFC] assessment." [AR at 15]  In his written decision, the ALJ identified the following four reasons for finding plaintiff's subjective allegations of disabling symptoms as not being wholly credible: (1) objective record evidence; (2) the conservative, routine course of treatment; (3) plaintiff's daily activities; and, (4) evidence of symptom exaggeration.  This Court notes that the ALJ did not disregard plaintiff's testimony entirely, but rather moderately discounted it to the extent it was inconsistent with the overall record.

First, as to the objective record evidence, the ALJ observed that Dr. Eriks' July 2010 examination of plaintiff yielded relatively normal findings including full range of motion in the neck, shoulders, hands, hips, knees, and ankles; no muscle spasms or tenderness in the muscles running next to the spine; normal strength in the arms and legs; good grip strength; no reflex abnormalities; normal gait; and, that he did not require an assistive device. [AR at 15]  Dr. Eriks reported that plaintiff had no restrictions in lifting carrying, standing, walking, or sitting.  The ALJ also pointed to the April 2011 findings of Dr. Macho and Dr. Prieto.  Dr. Macho reported on April 21, 2011 that plaintiff should pursue an exercise program and that he might benefit from the advice of a physical therapist to identify exercises that he could carry out without exacerbation of his pain.  The ALJ stated that Dr. Macho's findings "are indicative that [plaintiff's] complaints are not fully substantiated by the objective medical conclusions...." *Id.*

Dr. Prieto stated that plaintiff's left ankle range of motion was mostly normal; asserted that plaintiff would likely experience intermittent, moderate discomfort due to this condition; administered an injection and provided a promising prognosis for his frozen left shoulder; opined that plaintiff's residual bullet wounds were not a surgical problem; and, referred him to Dr. Macho for what plaintiff suspected was a hernia.  On a follow-up visit, Dr. Prieto noted that none of plaintiff's medical conditions should prevent him from employment, but did report that plaintiff would likely need to change

position every 1.5 to 2 hours for a few minutes; could continuously walk for 1.5 hours and stand continuously for 1 to 1.5 hours; and, that he should be able to get back to doing overhead lifting upon resolution of his frozen shoulder by the end of 2011. The ALJ assigned considerable weight to the opinion of Dr. Prieto, finding it well-supported by the medical evidence. [AR at 16] To the extent Dr. Eriks did not recognize the same limitations recognized by Dr. Prieto, the ALJ assigned less weight to Dr. Eriks' opinion regarding those limitations, stating that plaintiff's medical conditions presented more severe limitations and explaining that Dr. Eriks did not have the opportunity to review certain additional medical evidence submitted after her evaluation of plaintiff. *Id.*

Second, the ALJ explained that the conservative treatment of plaintiff's symptoms undercut the severity of the disabling symptoms described by plaintiff. [AR at 15] Using plaintiff's conservative treatment plan as a basis for discounting his subjective pain testimony is acceptable. *See e.g. Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995). The ALJ noted that, since his alleged onset date, there was no record of plaintiff being hospitalized for his impairments, and no showing that he had received significant care other than conservative routine maintenance. *Id.* The ALJ cited plaintiff's testimony that he treats his daily pain with Aspirin, and occasionally with Vicodin (roughly once a week). [AR at 15] The ALJ also noted that there is no evidence that plaintiff is prevented from effectively ambulating, does not require an assistive device, and that while he has some upper left extremity limitations, "his own doctor reports that he will be able to perform overhead lifting by the end of [2011]." *Id.* Given this conservative treatment plan, the ALJ reasoned that plaintiff's "allegations of severe pain appear to be exaggerated....There have been no significant increase[s] or changes in prescribed medication reflective of an uncontrolled condition, nor did [plaintiff] describe side effects from his medication that would prevent him from substantial gainful activity." *Id.* Accordingly, this provided the ALJ additional

support in discounting plaintiff's subjective pain testimony, and such consideration is proper.

Third, the ALJ observed that plaintiff is able to "care for himself and maintain his home." [AR at 16] Specifically, the ALJ noted that plaintiff is able to "use a computer, drive, and do errands for his wife." *Id.* Thus, the ALJ discounted plaintiff's credibility to the extent that his daily activities suggest he is more functional than he represents. This consideration is proper. *See e.g. Burch v. Barnhart*, 400 F.3d 676, 680 (9th Cir. 2005).

Fourth, the ALJ took note of one specific instance that "strongly suggest[ed] that [plaintiff] has exaggerated [his] symptoms and limitations." [AR at 16] Dr. Eriks reported that during a June 28, 2010 examination, plaintiff "stated he was unable to dress or undress himself; however, he was seen dressing himself quickly after the examination and left with no problems. He also later removed and later replaced his shirt, tie, and suit coat for x-rays without difficulty." *Id.* The ALJ found "this significantly impairs [plaintiff's] credibility as to the severity of his symptoms." *Id.* This type of symptom exaggeration, on its own, renders a claimant not credible. *See Greger v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006).

Given that these four clearly identified reasons are contained in the ALJ's November 10, 2011 written decision, plaintiff's allegation that "the ALJ decision is void of any sufficient rationale at all as to why the ALJ ignored and disregard[ed] [plaintiff's] testimony" [Doc. No. 16-1, p. 5] is clearly without merit. Plaintiff contends that "no evidence of malingering exists" or that any evidence of malingering "has been rejected by the objective medical evidence," and that the ALJ rejected plaintiff's testimony solely because it was inconsistent with the objective medical evidence and that the "regulations specifically prohibit rejecting subjective pain testimony solely on the basis of objective medical evidence." [Doc. No. 16-1, pp. 6-7] Again, this assertion is unsupported by the text of the November 10, 2011 written decision. In addition to the objective medical evidence, the ALJ also relied on

plaintiff's conservative treatment plan, his daily activities, and a specific instance where plaintiff exaggerated his symptoms to a medical provider as grounds for discounting plaintiff's subjective testimony.

Defendant argues that the ALJ properly discounted plaintiff's testimony regarding his alleged symptoms because "he had no more than conservative routine treatment for them, his daily activities were inconsistent with them, there was little objective medical evidence to support them, and there was record evidence that he was exaggerating his symptoms." [Doc. No. 17-1, p. 3] This Court agrees. "Unless there is affirmative evidence showing that the claimant is malingering, the ALJ's reasons for rejecting pain testimony must be clear and convincing." *Burch v. Barnhart*, 400 F.3d 676, 680 (9th Cir. 2005). Here, the ALJ provided four clear, convincing, and legitimate reasons for discounting (not wholly rejecting) plaintiff's subjective pain testimony. Each reason is supported by the overall record, and each erodes plaintiff's subjective testimony. The caselaw and Regulations require an ALJ to provide clear and convincing reasons for rejecting a claimant's subjective pain testimony. *Id.* ALJ Steinman has met the required standard in this case. Accordingly, the Court finds the ALJ properly supported his decision to discredit plaintiff's subjective symptom testimony by utilizing the record as a whole and providing sufficiently specific examples to ensure that he did not simply "arbitrarily discredit" plaintiff's subjective testimony. *Thomas*, 278 F.3d at 958.

## VI. CONCLUSION

Based on the preceding discussion, this Court concludes that the ALJ's denial of benefits was supported by substantial evidence and was free of legal error. Therefore, the Court **RECOMMENDS** that plaintiff's Motion for Summary Judgment [Doc. No. 16] be **DENIED**, and that defendant's Cross-Motion for Summary Judgment [Doc. No. 17] be **GRANTED**.

This Report and Recommendation ("R&R") is submitted to the United States District Judge assigned to this case pursuant to 28 U.S.C. § 636(b)(1). Any party may

file written objections with the Court and serve a copy on all parties **within 14 days of being served with a copy of this R&R**. The document should be captioned "Objections to Report and Recommendation." Failure to file objections within the specified time may affect the scope of review on appeal. *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991).

Date: July 24, 2014

KAREN S. CRAWFORD
United States Magistrate Judge